## COURT OF GENERAL SESSIONS — CITY AND COUNTY OF NEW YORK.

June 18, 1924.

## THE PEOPLE v. JOHN FARSON.

(123 Misc. 351.)

(1) INDICTMENTS—PENAL LAW § 953—MANIPULATIONS OF PRICES OF SECURITIES—WASH SALES.

An indictment charging defendant with the crime of manipulation of prices of securities in violation of section 953 of the Penal Law is based on sufficient legal evidence and a motion to dismiss should be denied, where it appears that the defendant's firm purchased and sold stock for their own account through the medium of brokers and specialists at identically the same price, in the same amount, and without evidence of a genuine, simultaneous change of ownership; that the defendant testified before the Stock Exchange committee that the sole purpose of h's buying and selling the stock at the same price was to advertise the securities and create a market for them; and that his testimony before the committee, which subsequently became a part of the minutes of the grand jury which indicted him, furnishes the requisite proof implicating him as the prime promotor in a scheme to inflate the price of the stock.

(2) SAME—GRAND JURY—STRICT RULE AS TO ADMISSIBILITY OF BOOKS OR TRANSCRIPTS THEREOF SHOULD NOT PREVAIL IN GRAND JURY ROOM.

The refined and stringent rule with respect to admissibility of books or transcripts therefrom should not prevail in the grand jury room, since if an error be made, it may be corrected upon the trial.

(3) SAME—PENAL LAW § 951—MOTION TO DISMISS INDICTMENT FOR VIOLATION OF PENAL LAW § 951 GRANTED WHERE PROOF SHOWED A SALE OF 300 SHARES INSTEAD OF 3,000 CHARGED, WITH LEAVE TO RESUBMIT CHARGE.

An indictment pursuant to section 951 of the Penal Law charging the defendant with the crime of reporting and publishing fictitious

transactions in securities should be dismissed with leave to the district
attorney to resubmit the charge, where it appears that while the indict-
ment charged that the defendant reported and published in a newspaper
a transaction involving 3,000 shares of a certain stock, in which no
actual change of ownership and interest was affected, the proof showed
a sale of 300 shares, since there was nothing to show that the 300 shares
were in any way connected with the transaction involving the 3,000
shares.

MOTION to dismiss indictments.

*Joab H. Banton, District Attorney (Albert Blogg Unger,* of
counsel), for the people.

*Robert S. Johnstone* and *Saul S. Myers,* for the defendant.

ROSALSKY, J.:

The grand jury returned two indictments against the
defendant, in one of which he is charged with the crime of
manipulation of prices of securities (Penal Law, § 953), and
in the other with the crime of reporting and publishing fictitious
transactions in securities. Id. § 951.

The principal objection urged against the validity of both
indictments is that there is no legal evidence to support the
allegations that the purchase and sale of shares of stock of
the Hercules Petroleum Company were " fictitious trans-
actions and devices, for and on account of the defendant,
whereby neither in whole nor in part was a simultaneous
change of ownership, or of interest in such stocks effected, as
the defendant well knew " (Penal Law, § 953), and " whereby
no actual change of ownership and interest was effected, as
the said defendant well knew." Id. § 951.

On this branch of the case the People presented proof
consisting of (1) the testimony of the defendant given by him
as a witness before a subcommittee of the New York Stock
Exchange; (2) his written answer to charges filed against him

by this subcommittee; (3.) the books of the defendant and of several brokers to whom the firm of the defendant gave orders to buy and sell for their own account stock of the Hercules Petroleum Company.

The matters embraced in these subdivisions are so correlated to each other that they will be considered and discussed together.

The defendant is a member of the firm of Farson Son & Co., engaged in the bond and brokerage business. He was a member of the Stock Exchange and was expelled from that body after a hearing because of his violation of section 7 of article 23 of the constitution of the New York Stock Exchange, which forbids fictitious transactions in stock.

The defendant's firm, in the early part of 1919, purchased 60,000 shares of stock of the Hercules Petroleum Company, each share being of the par value of ten dollars. They later acquired 20,000 additional shares under certain options and they succeeded in selling the 80,000 shares to the public over the counter and on the curb at various prices ranging from ten dollars and fifty cents to twenty-two dollars and fifty cents per share.

The defendant admits that his firm on the same day gave orders for the sale and purchase of such stock, and that such orders were executed at the same price with respect to a considerable number of the transactions contained in the schedule annexed to the charges filed by the Stock Exchange committee, and he also admits that such similar transactions took place on various other occasions. He stated that the motive that induced his firm to give purchasing and selling orders at the same price and on the same day was solely to advertise the stock in which they were largely interested and to be sure of an actual quotation at the current price, and in that way to keep the market steady. The books of the defendant's firm show that they traded in several thousand of shares of

the stock for their own account; and that defendant stated that the object of such trading was " to help the sale of stock."

After the stock had begun to be traded in upon the curb, the defendant and the other members of his firm decided that as they could not prevent curb trading, it was deemed best to stimulate such trading as far as possible so as to show their customers that there was a ready active market and considerable interest in the stock. He admitted that the appearance of such a market may have been a benefit to his firm. The reasons that his firm found it necessary to accelerate the activity of the market were that sales on the market, in the ordinary course of business, though frequent, were not always sufficiently frequent to be relied upon as there would be occasional days when no sales whatever would take place, and that his firm had no means of knowing whether on a given day there would or would not be sales other than those to which his firm was a party.

The defendant admitted that occasionally the buying and selling orders met; that on such occasions his firm " delivered the stock to the party who sold it and they delivered it back to us again "; and that his firm paid a commission on such transactions, although they were purchased for their own account at the same selling and purchasing price. He stated that the reasons for his firm engaging in such practices were to advertise the stock, to establish where the market was, and to make it appear that those particular transactions had taken place as genuine transactions.

The defendant led the public to believe by these transactions that the stock was selling more frequently on the curb than it actually was, and he stated that his purpose in engaging in such transactions was " to get more buyers all the time."

The defendant, as a witness before the committee on business conduct of the Stock Exchange, gave certain testimony which was properly proved before the grand jury, and which, among

other things, is as follows: " Mr. Burr: Yes, taking everything into consideration. Therefore your operation was one in which you were trying to dispose of stock to the public. Your circulars showed that, didn't they? Mr. Farson: Yes, I think it was 80,000 we sold; I may be a little off on the figures; and when we ended up, as I remember now, we had 8,000 shares which we bought around 18, something like that. Mr. Burr: You had that left over? Mr. Farson: Yes. Mr. Burr: But in the long run you had sold a large amount of stock to the public. In order to do that you did what you call ' advertise the stock.' In order to facilitate the sales in making certain transactions, which were transactions that appeared on the tape, which were transactions in which there was no change of ownership. That is what that ' advertising' consisted of, didn't it? Mr. Farson: That is what happened if you consider when I sell it through one house and buy it through another house as a fictitious transaction. Mr. Burr: Then it is a fact is it not that you made these transactions without any change of ownership to ' advertise the stock ' and that ' advertising the stock' consisted in making it appear that it was selling at certain prices, thereby facilitating your selling it on balance to the public? That is what actually happened, isn't it? Mr. Farson: That is about right, yes. We were also making a market for it down there on the curb. Mr. Burr: And that was the way in which you made the market? Mr. Farson: Only part of the way."

The defendant delivered to the Stock Exchange the firm's blotters and books containing transcripts, notices and entries in regard to the transactions in Hercules Petroleum stock in the year 1919.

Charles P. Matthews, an accountant of the Stock Exchange, testified before the grand jury that he prepared a recapitulation from the books of the defendant's brokers " of the selected items " of the transactions in Hercules Petroleum stock for

and on account of the defendant's firm covering a period from April 30 to July 17, 1919. This recapitulation shows that the defendant's firm had participated in twenty-two transactions aggregating 4,200 shares where the purchase price, selling price and the certificate numbers of such stock were the same.

I think that from the evidence referred to and other evidence of a like nature, which it is unnecessary to recite, the only reasonable and natural deduction to be made therefrom is that these transactions were not made in good faith, that they were colorable only, and that the defendant and his firm merely went through the formality of buying and selling the stock for their own account in the open market, using the brokers and the " specialists " as a mere device to enable the defendant and his firm to stamp such transactions with the semblance of ordinary, genuine stock transactions. When these transactions are judged by their real character, it is manifest that the defendant and his firm by such trading stimulated the market and inflated or " puffed " the price of the stock, which on May 2, 1919, was selling at ten and one-half, and on July 17, 1919, reached twenty-two and one-half.

In this connection, it should be borne in mind that the defendant's firm dealt in 4,200 out of 16,600 shares of this stock (approximately twenty-five per cent) during the period mentioned. This trading activity must have had an appreciable influence on the state of the market, both with respect to buying and selling orders and the price of the stock.

The fact that stock was obtained on several occasions from Herman & Co., the so-called " specialists," in the open market, did not necessarily make such transactions *bona fide*. While such transactions apparently, and so far as the public was concerned, might have had all the indicia of an ostensible change of ownership, yet, when they are subjected to a critical analysis, it becomes clear that in none of them was there a

genuine, simultaneous change of ownership. The evidence permits the inference that the purchases and sales were merely pretended.

In all of the transactions recapitulated, where the defendant's firm purchased and sold stock for their own account through the medium of the brokers and specialists, the stock was bought and sold at identically the same price, and the same amount of securites bought and sold, bearing the same certificate number, passed from the defendant's firm to the selling broker; from the selling brokers to the specialists; from the specialists to the buying broker, and by him returned again to the defendant's firm. In other words, the ". specialists " who acted for the defendant's brokers, in receiving and delivering the stock, did so without profit or loss either to themselves or to the defendant's firm.

This view is further fortified by the defendant's statement that the sole purpose of his buying and selling the stock at the same price was to advertise the stock and to create a market therefor, as otherwise, on occasional days, there would be no market except for his own transactions. To say that, in these circumstances, the stock transactions of the defendant and his firm were real, and not pretended or fictitious, would be to give more consideration to their form than to their substance.

The defendant, in his answer to the charges preferred against him by the Stock Exchange, stated: " I desire to state one more thing in this connection, although I do not know whether the governing committee will consider it in any sense a justifying or mitigating circumstance. That fact is that I had not studied with minute attention the language of section 7 of article XXIII of the Constitution, which is the section forbidding fictitious transactions. My belief at that time was that this section was aimed at wholly imaginary transactions where there was not even a delivery of securities purchased

but merely reciprocal book entries. No doubt my interpretation of the section was unjustifiel except by its first sentence, and I am now advised that it covers transactions of the character involved in the charges now pending against me. I can honestly assert, however, that I did not understand it in 1919."

While this statement is not controlling as bearing upon the question whether the purchase and sale of the stock traded in by the defendant's firm were real, or pretended transactions, yet it is significant that his attorneys, who are noted for their high order of ability and wide experience in connection with litigation in stock transactions, advised him, as appears from his answer, that the transactions in which his firm engaged were fictitious transactions and prohibited by the constitution of the Stock Exchange. My only purpose in referring to the legal advice given to the defendant is to show that the attorneys who represented him before the Stock Exchange committee regarded the transactions as lacking in genuinenss. It is also significant that the Stock Exchange committee who, because of their vast experience, are experts in determining whether stock transactions are real or feigned, concluded that the defendant's firm engaged in fictitious stock transactions, and expelled him from membership in the Stock Exchange.

The defendant claims that the evidence falls short of connecting him with the acts set forth in the indictments, and that if any of the acts were committed by any of his partners, he cannot be held criminally answerable unless he aided and abetted them in their commission. In other words, counsel for the defendant argue that guilt being personal it is incumbent upon the People to prove the defendant's guilty participation in the transactions.

This argument is sound, and unless the evidence meets this test, the indictments cannot be sustained.

As I read the record there is no indefinitenes about the

defendant's connection with the manipulation of the prices of the stock of the securities of the Hercules Petroleum Company.

To point out the circumstances connecting the defendant with the crime set forth in the indictment based upon section 953 of the Penal Law would unduly prolong the discussion. It is sufficient to say that the testimony of the defendant before the Stock Exchange committee and his answer, taken together, furnish the requisite proof implicating him so far as the record discloses as the prime promoter in the scheme to inflate the price of the stock of the Hercules Petroleum Company.

The defendant complains that the book entries and the transcripts therefrom of different brokers setting forth the stock transactions of his firm were inadmissible because no proper foundation for their reception had been laid. While this ground of objection would be well taken upon the trial of the indictment, I think that the refined and stringent rule with respect to the admissibility of books or transcripts therefrom should not prevail in the grand jury room. The fact that incompetent evidence was received in connection with competent evidence is not a ground for setting aside an indictment, particularly in a case where the error may be corrected upon the trial, where it would be a very simple matter to supply the proof of which the defendant complains.

After a most careful consideration of the questions submitted for my determination, I cannot escape the conclusion that the indictment charging the defendant with the crime of manipulation of the prices of securities is based upon sufficient legal evidence and that the defendant should be tried thereon.

The next question to be considered is whether there is sufficient evidence to connect the defendant with the indictment charging him with reporting or publishing fictitious transactions in securities.

The specific charge set forth in this indictment is that on

May 2, 1919, the defendant, with intent to deceive, did report and publish and cause to be reported and published in the New York *Times,* as a sale of the stock of a certain corporation called Hercules Petroleum Company, a certain transaction therein between a certain firm of brokers called Gwynne Brothers and another firm of brokers called Moors & Schley, whereby no actual change of ownership and interest was effected as he, the defendant, then and there well knew.

The proof shows that on May 2, 1919, the New York *Times* published with respect to the stock of the Hercules Petroleum Company the following:

| Shares | High | Low | Last |
|--------|------|-----|------|
| 3,000 | 10¾ | 10¼ | 10¾ |

that on May 1, 1919, Gwynne Brothers sold to Moore & Schley 300 shares of Hercules Petroleum at ten and one-quarter; that Moore & Schley bought from Gwynne Brothers the said 300 shares at the same price, and that both of these firms acted as brokers for Farson & Co.

While the record further shows that the learned assistant district attorney presented to the grand jury additional evidence establishing that with respect to this transaction there was no actual change of ownership effected, I am unable to find any proof to sustain the allegation of the indictment that the defendant " did report and publish and cause to be reported and published in and by a certain newspaper and publication called the New York Times *  *  * " the sale of 300 shares of the Hercules Petroleum Company.

I agree with the learned counsel for the defendant that to say that the 300-share transaction referred to entered as a factor into the New York *Times'* publication of the 3,000 shares or that the 3,000 shares, as published in said newspaper, included the particular 300 shares, is to build upon speculation and suspicion.

If the New York *Times'* publication had only accounted for the particular 300 shares, or if proof had been offered connecting this transaction with the publication of the 3,000 shares, then there would be no question as to the defendant's responsibility for the publication of this transaction.

The motion to set aside " the publication indictment," based upon section 951 of the Penal Law, is granted with leave to the district attorney to resubmit the charge to the same or another grand jury.

Ordered accordingly.